## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

Criminal Case No.: 6:11-CR-356-ORL-36DAB

SHELDON JOEL RAMNARAINE,

     Petitioner/Affiant,

v.

UNITED STATES OF AMERICA,

     Respondent.

_____/

## SWORN AFFIDAVIT OF SHELDON JOEL RAMNARAINE

**COMES NOW,** Sheldon Joel Ramnaraine, Petitioner-Affiant and files this, his sworn affidavit in the above-styled case. The Petitioner hereby declares the following under the penalty of perjury, pursuant to Title 28 U.S.C. § 1746.

1.     My name is SHELDON JOEL RAMNRAINE and I am the Affiant herein. Your Affiant is 28 years old as of the date of this document. I am of sound mind and capable of making this affidavit.

2.     I pled guilty in the above captioned case upon the advice of my attorney, Francis Wesley Blankner, Jr. (aka "Buck"). I have maintained my innocence throughout the course of the case and my representation by Buck and always intended to proceed to trial. I have always felt very strongly that the FBI violated my rights in obtaining my "confession" and searching my dorm room and have always wanted to raise those issues with the court.

## INITIAL ENCOUNTER WITH LAW ENFORCEMENT
## AND INTERROGATION BY THE FBI

In February 2009 at the age of 18, the University of Florida ("UF") granted me acceptance as a full-time student. The university awarded me a full, tuition-paid, academic scholarship; I also earned a second academic scholarship from the State of Florida. I began attending classes at UF in the fall semester of the same year. I lived in on-campus dormitory housing for the entirety of my enrollment at UF and was pursuing a Bachelor of Fine Arts degree specializing in Graphic Design.

On Wednesday, March 23, 2011, during Spring Semester of my sophomore year, I was attending a Printmaking studio class on campus. I attended the class every Wednesday, from approximately 3:00 PM through 6:00 PM on the third floor of the FAC building. At the end of class, I exited the classroom with my friends and classmates. As I walked into the hallway, I heard a voice say, "Oooh… Sheldon's in trouble." I looked around to see where the voice came from but the hallway was crowded with other students and staff members, and I could not determine who made the remark.  As I walked forward, I noticed two men standing in the hallway a short distance away. They were unfamiliar and seemed out-of-place. Both men wore professional-looking suits (one black and one gray) with ties. An armed police officer with the University of Florida Police Department ("UFPD") accompanied the men. The three men approached me as I walked forward. The man in the black suit quickly flashed what appeared to be a police badge and introduced himself to me as Special Agent Rod Hyre with the Federal Bureau of Investigation. He introduced the other man, Agent Steve McElyea, as his partner. I had never previously had any contact or involvement with law enforcement or the FBI before this day.  I later learned the name of the UFPD officer to be Michael Metz (ID#55).

SA Hyre asked me if I was Sheldon Ramnaraine and I became even more nervous because I had no idea how he knew my name. I confirmed my name and he then asked for identification. I

did not have a driver's license at the time so I gave him my Florida Learner's Permit. He inspected it but did not return it. SA Hyre then asked me if I knew why they were there. I shook my head and said no; then I asked, "What's this all about?" I had never been in trouble with the law before so my mind automatically went to the worse-case scenario. I worried that something bad happened to my mom because she suffers from heart problems and high blood pressure. In response, SA Hyre said, "You REALLY have no idea why we're here?" His tone scared me. My anxiety quickly turned into fear and I asked, "Did something bad happen?"

Agent McElyea said they needed to ask me some questions. I asked, "About what?" SA Hyre then said, "Come with us." He put his hand on my shoulder and guided me to the other end of the building.  He carried a manila office folder in his other hand. Agent McElyea and the UFPD officer led the way in front of us. The officers brought me to a glass entrance that led into a large room at the other end of the building. SA Hyre and Agent McElyea walked through the glass entrance while I waited outside with the UFPD officer. I did not know what was happening, so I asked the UFPD officer what was going on and if I needed an attorney while we waited. The UFPD officer said, "You'll have to ask them." Shortly after, the agents returned and instructed me to enter the room. SA Hyre led me through the glass entrance, into the main room. Agent McElyea and the UFPD officer followed behind us.

A long table—about the length of the room—was located inside. A second doorway was also located on the opposite wall. The doorway led into a second room that was larger than the first; it was dark and echoed. Its purpose was to screen video projects and school assignments by students who majored in Digital Media. SA Hyre led me into the second larger, dark room. Agent McElyea entered behind me but the armed UFPD officer remained standing outside the doorway, preventing anyone else from entering or exiting the dark room.

3

Two chairs and a desktop computer on a desk were located inside the dark room. SA Hyre told me to sit in a chair that was positioned in front of the desk. SA Hyre stood in front of me with his arms crossed, leaning against the computer desk.  He had a bulge at his waist which I believed to be a firearm. I believe all law enforcement officers to regularly carry firearms and assumed they were both armed.  Agent McElyea dragged the other chair to the doorway and sat facing me. He blocked the room's only exit while the UFPD officer stood on the other side.

After Agent McElyea and I sat, SA Hyre asked me if I preferred being called "Sheldon" or "Joel." I told him that most people called me Joel. He placed the office folder that he was carrying on the desk next to him. I noticed a black and white print-out of my old MySpace profile on top of the folder. An unmarked CD in a paper sleeve sat on top of the pile. SA Hyre pointed to the stack and said, "Is there anything you'd like to confess?" At this point, my heart was racing and I was terrified. I did not know what was happening. I looked up at SA Hyre and said, "I have no idea what you're talking about."  SA Hyre asked me if I knew anything about child pornography (which the agents referred to as "CP" thereafter). The question caught me off guard. I shrieked and impulsively responded, "Oh my God, no!" SA Hyre picked up the CD and held it between his thumb and index finger. He waved it and said, "It's all right here, Joel." He explained that "it would be best" if I "just tell the truth." SA Hyre also said that he did not want to have to "go home" to my parents' house and "bother them." I said, "What's all right there? I don't have any child porn."

About this time, a fellow classmate named Char Coale came to the doorway. She and her boyfriend, Stephen Lefebvre, were sitting against the other side of the wall in the main room (I had noticed them sitting against the wall when we entered the first room). She said, "Excuse me,"

but SA Hyre asked her to leave and close the door. She politely complied with SA Hyre's instructions.

I asked SA Hyre if I needed an attorney but the agents said that I was "not under arrest." However, I did not believe I could leave. I was afraid that they would take me to jail if I did not do what they wanted me to. This was my first experience with law enforcement and I simply did not understand what was happening, what my rights were, or what to do.

They continued to ask me about—and imply that I possessed—child pornography. I became frustrated because I genuinely had no interest in child pornography and I did not understand their intentions. I told them about an incident that happened a few months prior where I unexpectedly stumbled across some files I thought were child pornography online. I explained that I immediately deleted the files when I realized what they were. SA Hyre wanted to know how soon I deleted the files after coming upon them. Again, I explained that I deleted the files within the same day, as soon as I realized what they were. SA Hyre seemed unsatisfied with my answer.

SA Hyre asked me what I was doing when I came across the child porn files. I told him that I was not comfortable talking about it. In response, Agent McElyea said, "I think I have a pretty good idea." The truth of the matter was that I was viewing adult gay pornography online. I felt *very* uncomfortable talking about it because I was only 20 years old at the time and **no one,** with the exception of two or three close high school friends, knew I was gay. I had not even expressed my true sexuality to *any* of my college classmates. I was **terrified** of my parents finding out that I was gay because of their conservative Christian beliefs, their cultural background, and their general disapproval for homosexuality. During the interrogation, I complied with the agents' commands and often told them what I thought they wanted to hear because I feared SA Hyre would follow through with his threats to "go home" and "talk to [my] parents" about it. I explained my

5

true feelings to the agents. Nevertheless, they exploited my secret to elicit the types of responses they wanted.

SA Hyre asked me how many times I came across child pornography. I told him that it only happened once. The agents then asked, "Didn't it happen more than that?" Again, they were not satisfied with my answer and I felt backed into a corner. One of the agents explained that based on their experience, people would oftentimes download child pornography, view the files, delete them, and then re-download them again later. The agents said that this is usually how it worked for people who had a "conscience." Again, I told them that I was not interested in children or child pornography, and that is not what happened.

They also asked me how many pictures of child pornography I had downloaded. I told them that I had no way of knowing that because I was not looking for child pornography, and so I was not keeping track. To that, SA Hyre said, "Surely you have some idea." I said "no," but SA Hyre wanted a specific number. SA Hyre started making numerical suggestions and asked whether the *actual* number was higher or lower than the one he suggested. For example, he would ask, "Is it higher or lower than 100?" or, "Is it higher or lower than 200?" In response, I would offer answers like, "I guess," "I don't know," or "maybe." This type of interrogation went on until SA Hyre elicited a response he was satisfied with. During the interrogation, SA Hyre settled on the number 500. I made it clear that I could not offer an honest answer because I was not looking for child pornography and I simply did not know.

SA Hyre then asked me if I used the username "daddysboi1991" on Gigatribe. Again, I told SA Hyre that I did not feel comfortable answering his questions. I said, "Maybe I need a lawyer," but SA Hyre then pointed to the stack of papers on the desk and said, "Listen Joel, it's all right here. We're just asking you to confirm what we know." SA Hyre then said that "It will go in

your favor if you're honest with us." His statement seemed contradictory because he became very frustrated whenever I was honest.

After some time, the agents began asking more questions about my sexuality and my relationship. I had already told them that I was secretly gay and that my parents were unaware of my sexuality. But they wanted to know more about my boyfriend. I explained that I was in a three-year relationship with a 39-year-old man from Orlando. Agent McElyea was shocked when he heard this. In a tone of disbelief, he said, "You're still together? Maybe he's the pedophile." It was very demeaning. I felt a mixture of helplessness and frustration, and like Agent McElyea was making fun of me. He was implying that no one could want me for more than just my boyish features. The agents were fascinated by my relationship, and acted as though it was the funniest thing they ever heard. Agent McElyea asked me how old I was. I told him that I had just turned 20 and he said, "Oh yeah, you're too old from him now. There's no way he's not cheating on you. He's got some young thing back in Orlando." I was completely embarrassed. This was part of the reason I was so afraid of coming out in the first place. The questions about my boyfriend went on for about ten to fifteen minutes. I could feel a lump in my throat and I wanted to cry, but I was too scared.

As the interrogation progressed, SA Hyre asked me how often I distributed child pornography. I told them that I had never distributed child pornography. He then said, "Well, if you downloaded CP, and it went to your shared Downloads folder, then it would have been available and other pedophiles could have gotten it, right?" I told him again that I did not like children and that I was not a pedophile. Again, I explained that I deleted any and all files of child pornography because I was not interested in, or looking for, child pornography. Still, SA Hyre wanted a specific number, but I could not give him an answer. SA Hyre then asked how many

7

people *might* have had access to the files in my Downloads folder during that time. I answered, "I don't know. I really can't answer that question," but SA Hyre continued to badger me. He started throwing random numbers again and suggested, "Five? Maybe ten?" I was tired of being badgered, so I finally acquiesced and said, "Maybe." SA Hyre then stated, "So basically, you would say your distributed CP about ten times." In response, I said, "No, that's not really what I said." SA Hyre then said, "I mean, we've got to have a number, so ten sounds good, right?" His tone was very nonchalant, as though it was no big deal but I knew that things would be bad if I did not cooperate. Exhausted, I said, "Sure, if you say so."

We were in the interrogation room for about two hours after my class ended. The agents asked me many questions and badgered me non-stop until I told them what they wanted to hear. Many times it was not true. Towards the end, SA Hyre asked me where my computer was. I told him it was on my desk, back at my dorm. He then said, "We'll need to go to your dorm and get it then." I said that I didn't understand why that was necessary, especially after I made it clear that I did not have any child pornography. I was confused by the whole process and what was going on. SA Hyre said that they had to check my computer to verify that I was telling the truth.

### TRANSPORTATION TO DORM ROOM IN THE
### FBI CAR AND OBTAINING OF CONSENT

At the end of the interrogation, the agents stood while I stayed seated. I felt dazed and flustered. The entire experience was exhausting and I just wanted it to be over. SA Hyre walked to the door and said, "Let's go." SA Hyre and Agent McElyea escorted me out the room and we walked past the UFPD officer. The UFPD officer was still standing at the door and presumably had remained standing at the door for the entirety of the interrogation. The three officers escorted me downstairs using the staircase. We exited the building into a small parking lot behind the FAC

building. The sun was still out and I was incredibly embarrassed to be seen being escorted by three cops.

SA Hyre and Agent McElyea walked me to a black unmarked police car. The UFPD officer walked to his own squad car. SA Hyre and Agent McElyea told the UFPD officer that they would follow behind him. The agents then told me that they would drive me to my dorm so that they could "take a look at the computer." I explained that my dorm was very close and that I could just walk, but they said that I needed to stay with them. The agents then instructed me to get in the back seat of their car. Once inside, I tried opening the door but it would not open. I had never been in a police car before and I began to panic. I tried opening the door but it was locked and I could not unlock it. I then tried rolling down the windows, but they were also locked. I was locked in their car and I was terrified. My panic worsened and I started to physically tremble and sweat because I was so scared. I did not know what to do.

Agent McElyea drove the car while SA Hyre sat in the passenger seat. We followed behind the UFPD officer as he drove across campus to the police station. Agent McElyea parked in the UFPD parking lot, which is next to my dorm, and turned off the car. Once we parked in the parking lot, I do not know where the UFPD officer went. SA Hyre then turned in his seat and handed me a clipboard with paperwork on it. He said I just needed to sign some paperwork before we could continue. I was so scared that I did not fully comprehend what was happening. I just did what I was told to do because I was afraid the agents would take me to jail and tell my parents I was gay if I did not comply. I did not read the document that I signed. It was not read or explained to me. In fact, I did not realize that I signed a consent form until later. I handed the clipboard back to SA Hyre and he told me that I "did the right thing." After I handed the clipboard back to SA Hyre, he asked me to tell him all the electronics I had in my room. I started listing them out loud: a Dell

laptop, two Western Digital hard drives, and a flash drive. I then noticed that as I was speaking, SA Hyre was writing the items down on one of the forms I had just signed. I then realized what was happening. I stopped listing items and said "Aren't those forms for me to fill out?" SA Hyre stopped writing, looked back at me, and said, "It's okay, this is how we do it." I then asked, "You're not going to take all that stuff, right?" I was worried because I used my computer for work and school and it contained all my work files. In response to my question, SA Hyre said, "We're going to have to, don't you think?" I said, "Why? I don't want you to take it. It's got all my work stuff." SA Hyre then said, "Well, we'll have to see about that."

The agents got out of the car when SA Hyre finished writing and opened the back door to let me out. I reached an emotional breaking point and there were tears in my eyes. I did not know what to do. The agents led me out of the parking lot, and escorted me to my dorm. I did not want to take the agents to my room so when we reached the entrance of my dorm building, I asked, "Don't you need some kind of authorization to get in?" SA Hyre explained that they could go in since I was a resident and they were with me. SA Hyre then asked if I had a key and I said yes. He waived his hand forward, instructing me to open the door. I waved the key card in front of the key reader and one of the agents opened the door. I was in a trance-like state of shock and one of the agents said, "Come on," to get me through the door.

There were two more security doors in the hallway of the dorm that required the key-card to open. The agents instructed me to open each door and we walked down the hall to my room. When we got to my room, I was shaking with tears in my eyes. I pulled my keychain out of my pocket and tried to open the door but it was the wrong key. One of the agents said, "You don't really expect us to fall for that, do you?" I used another key and the door opened. The agents were

behind me and pressed me into the room. They followed behind me without ever asking for permission or if it was okay to enter.

## ADDITIONAL INTERROGATION AND SEARCH OF ELECTRONIC STORAGE DEVICES INSIDE DORM ROOM

Once inside my room, SA Hyre told me to sit on my bed. Meanwhile, Agent McElyea pulled the chair out from under my computer desk, sat down, and turned on my computer. I had left my computer running before I left, so all he had to do was move the mouse to turn it back on. The Windows login screen appeared when Agent McElyea shook the mouse. SA Hyre said, "We'll need the password, Joel." I hesitated and Agent McElyea said, "We can probably get around it." I was afraid that they might do something to hack my computer and I might lose my work, so I acquiesced and gave them the password. As I spoke, SA Hyre wrote the password down on the consent form I signed earlier when locked in their car.

After Agent McElyea logged into my computer, he searched for all image and video files on my hard drive using Windows Explorer. In addition to my computer, Agent McElyea also searched my external drives including two hard drives and a flash drive. Although the search produced hundreds—possibly thousands—of images and videos, no child pornography was found on any of my devices.

Agent McElyea fruitlessly searched my devices for about ten to 15 minutes. After not finding any child pornography, Agent McElyea inserted the unmarked CD into my computer—the same CD SA Hyre previously waved around and claimed had "everything on it." Agent McElyea then restarted my computer and booted the computer. I did not realize the agents would insert anything into my computer, and I had no idea what was on the disc or what changes it may have been making to my computer. After the computer loaded, it seemed that the disc contained some type of forensic search utility.

Agent McElyea used to the software on the disc to search my computer and devices for child pornography again. However, like before, the search was fruitless and the agents did not find any child pornography on my computer or electronic storage devices. The second search took longer and appeared to be more comprehensive but produced the same results as the first search. I was not surprised because—like I repeatedly stated to the agents—I did not have any child pornography.

The agents, however, took every opportunity to make fun of me. While conducting the search, the agents came across an image of a nude Sarah Palin impersonator from a parody called, "Nailin' Palin." The agents thought this was hysterical and said, "Shouldn't you be looking at little boys?" I was very upset and told the agents again that I was not interested in little boys. In response, Agent McElyea said, "You invited us into your room to confess you like Sarah Palin?" I became momentarily angry and said, in a stern loud voice, "I didn't INVITE you anywhere and I wish you'd leave!" I was unraveling after being pushed around by the agents for almost three hours. This is not how I ever believed or knew police officers to act.

## SEARCH OF TRANSCEND MEMORY CARD

As Agent McElyea was getting up, he pointed to a memory card next to my computer. I am unsure where the memory card came from. I am uncertain if it is mine. I also do not know if the agents manipulated it in some way. I regularly used memory cards because I was a photographer and used them in my camera when taking pictures. I usually kept my memory cards in my camera or my computer at all times because that is how I transferred images from my camera to my computer in order to work with them. Agent McElyea had to manually insert it into the computer's memory card reader. When Agent McElyea inserted the card into the computer, a window appeared showing all the files on the card. The memory only contained two files with long files names. The file names contained random characters and phrases that left the general

impression of child pornography. There were no other files stored on the memory card. I immediately knew something was not right because my memory cards were always full of hundreds—sometimes thousands—of images. This is because as a graphic designer, I routinely worked with the images, and only deleted portions of images as necessary. I would delete *all* the files from my memory cards—on rare occasion—only if I had an important upcoming project or photoshoot that required a lot of storage space. As a result, my memory cards were always either full of images or completely empty (on rare occasion), but never anything in between.

Furthermore, my memory cards all contained a folder called "DCIM" which was automatically created by my camera. This memory card, however, did not contain any folders; it only contained the two files. Immediately, Agent McElyea said, "Look what we have here." SA Hyre added, "Well, well, well." The agents seemed rather melodramatic, as though they were acting. In a loud tone, I said, "That's not possible… that can't be my card! I don't have any CP!" Agent McElyea signaled to the screen with his hand and said, "Are you telling me those aren't CP? Look at the file names." SA Hyre then said, for the hundredth time that day, "Joel, you really don't want to lie to us. You're only making harder on yourself." He told me it would be better if I just admitted the files were mine. However, the two files on the memory card were not mine, I did not recognize them, and I had no idea how they would end up on my memory card.

Suddenly, it was as if my fear was replaced with anger. These were not my files and this could not have been my memory card. I hopped off my bed and double clicked on one of the files using the mouse. The computer launched a program called Windows Live Photo Gallery, however, an error message also appeared that said something to the effect of, "Windows Live Photo Gallery cannot open this file because it is corrupt or not a valid image file." As it turns out, both files were fake. Almost yelling, I said, "Look at that! Why in God's name would I download two fake CP

files, put them on my memory card, and just leave them there?" It did not make any sense and SA Hyre said he did not know why.

As SA Hyre spoke, Agent McElyea shut down the computer. Agent McElyea then rose from my desk and said, "Well, we're going to have to take the equipment for more forensics." SA Hyre then said to him, "Pack it up." My anger was worsening and I yelled, "You can't take my stuff!" SA Hyre then said, "Sure we can. You signed a consent form." I said, "It was blank! And I never agreed to let you take my computer." SA Hyre then said, "I guess you'll have to get a new one." I said, "This makes no sense! It says right there in big letters: consent to SEARCH, not consent to TAKE!"

My anger was getting the best of me and I said, "You said everything would be okay if I cooperate, now you're taking my computer?" As though to pacify me, SA Hyre said, "Well we're not arresting you." I asked the agents if they were coming back and if I could and should finish the semester. SA Hyre said in a friendly tone, "It's possible that it could take that long. Don't just quit school."

In the end, the agents took my belongings even though I told them not to, and even after not finding any child pornography. They even took the memory card,which was not even listed on the consent to search form. Before they left, SA Hyre filled out another form, handed it to me, and asked me to sign it. I was apprehensive because I did not want to mistakenly give them any more permission like before. I explained that I did not feel comfortable signing it. I also took issue with the fact that SA Hyre checked the "Received from" box instead of the "Seized from" box, and that the form listed the home address of my parents and not my dorm. However, SA Hyre explained that the form merely acknowledges that the items were taken. Additionally, I was emotionally,

14

mentally, and physically exhausted. The entire experience was a nightmare and undesirable, and I just wanted it to be over.

The ordeal was finally nearing an end and SA Hyre told me not to worry. He said nothing will probably come of this and that I should just go about my life as normal. The agents then exited my room and I walked down the hall towards the exit. I closed the door, went to my bed, and began to sob. I had no idea what to do next. I felt as though I had just escaped after being held hostage by two men with guns.

During my time with SA Hyre and Agent McElyea, I did not know what to do, say, or think. My senses were completely overwhelmed and I was in a state of shock; all of this was brand new to me, and my mind could not process any of it at the time. Nothing about the experience was voluntary. I did not want to speak with the agents; I did not want to get in their car; I did not want to sign any paperwork; I did not want them in my room; and I did not want them searching through my property. I only spoke with them, went with them, and signed the form because they made me feel as though I had no choice. The agents never informed me of my rights and I had no idea what I could or could not do. I was terrified that they would take me to jail and expose my homosexuality to my family if I didn't do and say what they wanted me to.

SA Hyre omitted most of these facts in his report. Worse were the blatant lies in his version of the events. For example, in the very first paragraph of his report, SA Hyre falsely stated that I was "interviewed on the University of Florida campus in the Jennings dormitory, in room 1112." This is lie; as stated previously, the interrogation occurred in the FAC classroom building on the University of Florida campus. It would be physically impossible for SA Hyre's narrative to be true because he would not have been able to enter my dorm building, and reach my dorm room, without me unlocking the three entrance/security doors and my personal room door. Contrary to SA Hyre's

false report, I never stated that I felt I had been "treated fairly by the investigators throughout the interview." I did not feel as though I had been "treated fairly." In fact, I felt pressured and coerced the entire time. At the time, I felt as though I had no other option but to cooperate and comply with the agents' demands, despite the fact that I did not want be a part of any of these events. No reasonable person *could* feel as though they were treated fairly. This was simply a false statement SA Hyre made in an attempt to justify his and Agent McElyea's coercion.

## REPRESENTATION BY BLANKNER

In April of 2011, my mother, sister and I met with Buck (Blankner) for the first time. I had found him through a Google search for local criminal defense attorneys. I relayed to him my encounter with the FBI. Buck claimed that he had extensive experience with child porn cases and had handled many state and federal cases like this in the past. He told us that it did not appear that I would be indicted, but that he would speak with the U.S. Attorney immediately regarding the matter if we paid him a $10,000.00 retainer. Buck stated that he would only charge more money if an indictment was filed; he said, however, that an indictment was unlikely. Like the FBI agents, Buck also said that it unlikely anything would happen. Our family did not have much money and my parents, two sisters, and their families all came together to pay Buck the $10,000.00 he requested. He said that he would get on the phone with prosecutor right away and sort things out. Buck reassured our entire family that he would take care of the matter.

I did not hear from Buck again until late October 2011. I received a phone call from him while I was in class at UF. Buck said, "I have some bad news." I said, "Okay, what's going on?" Buck then stated, "You're being indicted. You're going to have to leave school." At the time, I did not know what being "indicted" meant and Buck did not explain. I was more concerned with losing my scholarship if I left school. I asked Buck how many days I would need to take off from school.

He said, "Just withdraw for now." I was halfway through the semester and asked Buck if I would be able to return to school. Buck told me that I would most likely be able to return the following semester, in January 2012. Buck then told me to meet him at the courthouse on Monday, October 31, 2011 but did not explain why or what would happen. I assumed we were going to have a meeting with the prosecutor or some type of court official. After the phone call, I immediately went to the Dean of Students and explained that I needed to withdraw for the semester due to a family emergency. I returned home shortly thereafter.

On Monday, October 31, 2011, my parents and I arrived at the courthouse and met Buck outside as he had previously instructed. Shortly after entering the building and passing through the metal detectors, we were approached by a court official, presumably a U.S. Marshal. As I walked away with the Marshal, Buck advised me to go with Marshal and informed me not to worry, and that I would "go home today." I had no idea what happening and Buck did not provide any further explanation. I was led into an office with white bricks and no windows. The U.S. Marshal instructed me to sit in a chair next to his desk. The officer took my photograph, swabbed my mouth to collect my DNA, and placed me in handcuffs and shackles. I had no idea I would be placed in handcuffs or separated from my family. I was then placed in a solitary cell and told to simply wait. The U.S. Marshal reappeared approximately 15 to 20 minutes later and removed me from the cell. I was led to a courtroom where I saw Buck sitting at the defendant's table and my family in the pews at the back of the courtroom.

Although it was never explained to me, I believe this constituted my "arraignment." We were in court before a judge for a few minutes. I was too nervous to understand what was happening and Buck did not explain anything. Afterwards, we were led to a separate office in the

courthouse where I met a pretrial probation officer. I was fitted for an ankle monitor and told that I would be placed on "bond."

During pretrial, Buck informed my family and I that I would be given probation in the worst possible instance. We did not know what was happening but Buck reassured us, saying that he had seen cases far worse than this, and that my case was simply an "injustice." On a few occasions, my family and Buck joined hands in prayer. He told us to "go home and don't worry," because he had "everything under control."  From the beginning, I had been adamant that I was innocent and wanted to fight the case.

Although I did not know anything about the law, I did not feel comfortable with my interaction with the FBI. I explained to Buck that I was afraid and felt pressured during my entire encounter with the FBI. In November 2011, I specifically told Buck I wanted him to "try to suppress the evidence." I did not know how that process worked of even *if* it would work. All I knew is that the FBI's actions did not feel right. Buck stated that he was worried the prosecution would not "give [me] points for cooperation" if he tried to suppress the evidence.

At the time, I did not know how the judicial system worked or how court procedures functioned; I did not understand what "points for cooperation" were and I did not realize that "points for cooperation" were **irrelevant** when going to trial. I now know that "cooperation points" are only important when pursuing a guilty plea. I always indented to go to trial.  Buck, however, never provided any information or explanation regarding court proceedings, the law, or my rights. At the time, I did not understand why we could not suppress the evidence. I believed that the judge would be willing to suppress the evidence if we explained what really happened when the FBI came to UF to interrogate me and take my property. But in the end, Buck refused to file for suppression, claiming it would cost me "cooperation points."

Unfortunately, I had no one else to turn to and I relied solely on Buck's professional advice as my attorney. Buck made a unilateral decision against my request to file a motion to suppress. Afterwards, I tried repeatedly to convince Buck to suppress the evidence but he adamantly declined. Instead, Buck promised to retain a psychologist to testify on my behalf at trial. He said the psychologist could testify that I did not have an unhealthy attraction to children. Buck reassured us that, at worst, the court would impose five years of probation if we lost at trial. He also said that he wanted to "use my case" as an example to expose the absurdity of "these types of crimes." In the end, Buck never took the time to explain my options, consider suppression or validate my concerns.

Although he did not want to listen, Buck appeared to be very confident in himself and said all the right things to earn our trust. One day, he showed my parents and me three boxes overflowing with paperwork. He claimed it was all "research and evidence" for my trial.

In December 2011, Buck called me and my family into a meeting. He said he wanted to discuss my case and make us a special offer. My family had already paid Buck half of his $25,000 fee. In the meeting, Buck promised to forgive the remaining balance if our family could make one final lump-sum payment of $5,000; otherwise, we would be required to pay the full remaining balance. Money was tight but my parents, sisters, and brother-in-law all came together and, on December 15, 2011, we gave Buck a $5,000 check. Afterwards, Buck told us to go home and not to worry. He promised he would take care of everything.

Buck also informed us that the judge in our case changed from Judge Schriven to Judge Honeywell. Buck appeared shaken but still confident about this. Buck's story changed, however, with regard to sentencing. He said that I could be looking at five years in prison, instead of five

years of probation. Nevertheless, he assured us I would most likely receive probation if we lost at trial.

After our meeting with Buck, it became impossible to reach him. I left many messages and my family sent him numerous emails and we never heard back from him.  I wanted to follow up with Buck regarding his promise to retain a psychologist, and to discuss suppressing the evidence again. At this point, my family and I were still under the impression that Buck was preparing for trial.

About two months later, in February 2012, I received a call from Buck. He wanted to give me something at his office. When I arrived, he handed me a long document labeled Plea Agreement and asked me to read it and quickly make a decision, because we had to be in court the next day. I had no idea what was going on and Buck gave me no warning. He offered no explanation as to what the document meant and I did not know what to do. The meeting was only a few minutes. I reviewed the document but did not fully understand its purpose or its meaning. I called Buck the same day and told him that I needed more time to review the document. He said he would get a one-week extension from the court.

During that week, I asked my family to read the document but they were just as lost as I was. I received a call from Buck the day before our rescheduled court date. He told me not to sign the document because the judge would "give [me] a better deal." I did not know what that meant; Buck just told me to be at the courthouse the following day for the court hearing.

We arrived early at the courthouse and Buck told my family and me not to worry. He told me we had to enter a "plea." Without any further explanation, Buck instructed me to agree with everything the judge said and to follow his lead. I had no idea what the hearing was going to be about or what I was going to be asked. I blindly trusted Buck because he was my lawyer and told

me not to worry. In court, the judge asked me a series of questions regarding the charge. I simply agreed with everything, as Buck instructed me to do. The judge asked me to tell him about the crime. I told the judge I was guilty because that is what Buck told me to do. I stumbled with my words when telling the story. For example, I did not know what to say when the judge asked me to provide the time frame of the crime. Stumbling, I said, "Around December 2011, I think, or 2010." I was simply confused and did not know what I was supposed to say. I just went along with everything because that is what Buck told me to do. I now know that this hearing was my "Change of Plea" hearing where I "pled" guilty to the crime. At the time, these concepts were foreign to me and I did not understand what was happening.

The Change of Plea hearing occurred on March 8, 2012. Buck led me to believe that the hearing was just a formality in the entire court process. I believed that even though I said I was guilty, Buck was still proceeding to trial so a jury could make the final decision as to my actual innocence or guilt. After the hearing, I could not get in touch with Buck again. When I returned home from the hearing, my then-boyfriend helped me research the law and court procedures. He searched the internet for information on court proceedings and different types of hearings. Based on his research, I learned that my guilty plea meant that there would not be a trial.

Afterwards, I tried relentlessly to reach Buck to discuss my options and going to trial. Buck did not follow through with any of the promises he had made thus far: he would not talk to me any more about suppression and he stopped mentioning the psychologist he told us about. My family and I were left completely in the dark and unaware of what to do. My parents spent their entire life savings to pay Buck and we had nowhere else to turn. I did not know what to do and I could not reach Buck.

In June 2012, I received a call from Buck saying that I would have a chance to meet with the prosecutor and the FBI. I thought we were going to finally clear the air and get all the facts in order; I would finally get a chance to tell my side of the story. However, when I arrived, the FBI started asking me unrelated questions about my high school friends and again about my boyfriend. My old fears of the FBI exposing my sexual orientation resurfaced. The agents also wanted me to tell them whether my friends were involved in child pornography or other criminal activity. The questions caught me off guard and I responded the only way I knew: no. I left the meeting feeling even more helpless. I did not know what was happening but it did not feel good.

After multiple extensions of time, my sentencing hearing was finally set for July 12, 2012. Buck reassured my parents and me that my case was not as serious as "other cases," and that I would receive five years of probation. My parents, sister and brother-in-law came to my sentencing hearing. I wore a suit and tie with the belief that I would be returning home. We were all shocked when the judge imposed an 87-month term of imprisonment. We were even more shocked when I was immediately taken into custody. I started to hyperventilate and Buck said, "Don't worry, we're going to appeal this." The Marshal took me to jail and I was placed on "suicide watch" for 24 hours. No other inmates were subject to suicide watch and I can only presume that I was placed on suicide watch because my shock, fear, and state of trauma was evident to everyone around me. It was clear to the officers that I was unprepared for the court's sentence.

Buck was impossible to reach thereafter. About nine months after I went to prison, I found out through another inmate that my appeal was dismissed for lack of prosecution. I did not know what that meant so I immediately went to my Bureau of Prisons counselor and requested a legal call to Buck. After repeated attempts to reach him, we finally made contact. Buck told me that he did not "want to continue on with the appeal" because I would most certainly get resentenced to

more time. Instead, he said he wanted to file a § 2255 motion. At that point, I had already done some legal research in the prison law library, and knew that a § 2255 was usually filed against one's lawyer. Buck's statements did not make sense to me. How could Buck file a § 2255 motion against himself? Was that even possible?

Shortly thereafter, I reached out to another attorney, Richard Klugh, who helped me file a § 2255 motion against Buck. In 2015, the court determined that Buck had indeed rendered ineffective assistance of counsel, and granted my § 2255 motion for Buck's failure to prosecute my appeal.

During the course of my representation, Buck never reviewed discovery with me.  I honestly did not even understand what discovery was until much later.  I did not even receive a copy of discovery until Mr. Klugh was preparing my first § 2255 and asked me to obtain it.  At one point during the case, Buck had said he had been the US Attorney's Office and had looked at the images and they were "not that bad."  Buck never discussed the evidence against me or how strong the Government's case was or was not.  As far as I knew, I thought we were taking the case to trial as I intended.

My entire experience with Buck was a nightmare plagued with lies and deception. Buck exploited me and my family's ignorance of the law and judicial process to make quick and easy money. Buck did absolutely no work on my case and failed to present even the weakest of arguments on my behalf. Instead, the docket is filled with motions for continuances and extensions of time. Buck did not listen to anything I said, did not seek suppression as I instructed him to, did not retain a psychologist as he promised, and did not make any beneficial arguments on my behalf.

From the very beginning, I objected to the facts as falsely presented in the Presentence Investigation Report, as I do now.  Buck had an abundance of information and evidence to file for

23

suppression, yet he failed to do so. Even more egregiously, Buck lied about his intentions and the "work" he was doing on my case every step of the way. In the end, I paid for a lawyer who deceived me and did nothing to fight for me.

This is a true, correct and complete statement made with first-hand knowledge by Affiant, Sheldon Joel Ramnaraine, made this ___1___ day of ___October___ 2019 within the county of Osceola, Florida.

Sheldon Joel Ramnaraine

24